IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

JESSE A. SAMPSON,

        Plaintiff,

v.                                        Civil Action No. 2:05-cv-00268

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

<u>MEMORANDUM OPINION</u>

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By standing order, this case was referred to this United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the court are the parties' cross-motions for judgment on the pleadings.

Plaintiff, Jesse A. Sampson (hereinafter referred to as "Claimant"), protectively filed applications for SSI and DIB on February 27, 2002, alleging disability as of December 29, 1999, due to neck and back pain and numbness in his arms and legs. (Tr. at

86-88, 105.)   The claims were denied initially and upon reconsideration.  (Tr. at 64-7, 70-1.)  On September 25, 2002, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 72.)  An initial hearing was held on February 13, 2003 and a supplemental hearing was held on May 20, 2003, both before the Honorable Theodore Burock.  (Tr. at 275-325, 326-362.) By decision dated October 30, 2003, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 20-34.)  The ALJ's decision became the final decision of the Commissioner on March 3, 2005, when the Appeals Council denied Claimant's request for review.  (See Court Transcript Index and tr. at 5-7, on which date is illegible.)  On April 1, 2005, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R.

§§ 404.1520, 416.920 (2003).   If an individual is found "not disabled" at any step, further inquiry is unnecessary.   Id. §§ 404.1520(a), 416.920(a).   The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.   Id. §§ 404.1520(b), 416.920(b).   If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.   Id. §§ 404.1520(c), 416.920(c).   If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.   Id. §§ 404.1520(d), 416.920(d).   If it does, the claimant is found disabled and awarded benefits.   Id.   If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.   Id. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability.   Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).   The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.   20 C.F.R. §§ 404.1520(f), 416.920(f) (2003). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work

3

experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 21; Finding No. 2, tr. at 33.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of borderline intellectual functioning, dysthymic disorder, and a combination of orthopaedic impairments. (Tr. at 22; Finding No. 3, tr. at 33.) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 22; Finding No. 4, tr. at 33.) The ALJ then found that Claimant has a residual functional capacity for a range of light work, reduced by nonexertional limitations. (Tr. at 22-9; Finding No. 7 & 12, tr. at 33.) As a result, Claimant cannot return to his past relevant work. (Tr. at 29; Finding No. 8, tr. at 33.) Nevertheless, the ALJ concluded that Claimant could perform jobs such as a pattern ruler; handkerchief presser; subassembler; cutter-and-paster; press clippings; and dowel inspector, which exist in significant numbers in the national economy. (Tr. at 30-1; Finding No. 13, tr. at 34.) On this basis, benefits were denied. (Tr. at 32; Finding No. 14,

4

tr. at 34.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In Blalock v. Richardson, substantial evidence was defined as

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.   Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).   Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."   Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 37 years old at the time of the administrative hearing. (Tr. at 275, 280.) He has a high school education. (Tr.

at 282.)   In the past, he worked as a carpenter, tank cleaner, and truck driver.  (Tr. at 106, 114-7.)

<u>The Medical Record</u>

The court has reviewed all evidence of record, including the medical evidence, and will discuss it further below as necessary.

1.  *Physical Impairments*

Claimant alleges that his disability arose out of worsening residual injuries from a 1995 motor vehicle accident.  (Tr. at 105, 283.)  He claims that in this collision, he sustained broken ribs, crushed cervical vertebrae, internal injuries, and head trauma with a loss of consciousness.  (Tr. at 232, 283.)   He reports having cervical fusion which involved a bone graft from his hip to his neck. (Tr. at 171.)  He also reports having back surgery.  (Tr. at 283.)  Claimant did not submit any evidence, medical or otherwise, to substantiate these allegations.

The earliest record Claimant submits is a general physical by Mahendrakumar C. Shah, M.D. dated October 8, 2001.  Claimant underwent this physical in pursuit of a medical card.  (Tr. at 163-4.)  Dr. Shah recorded Claimant's complaints and opined that Claimant was unable to work as of that date, pending a complete orthopaedic evaluation.  (Tr. at 163-4.)  Office notes reflect that Claimant had no regular doctor and was not taking any medications. (Tr. at 202.)  Claimant visited Dr. Shah 16 times from October 2001 through July 15, 2002, with regular complaints of back, neck, and

6

arm pain and numbness.  (Tr. at 187-202.)  Dr. Shah ordered x-rays but performed no other objective testing, and did not refer Claimant for consultation or other forms of care.  He recorded no objective or clinical findings of his examinations, and appears to have managed Claimant's condition with medications alone.  (Tr. at 187-202.)  On his Disability Report, Claimant stated that he was taking Lortab 500 (hydrocodone), Skelaxin 400, and Naproxen 500 for pain, as prescribed by Dr. Shah.[1]  (Tr. at 110.)

On a Personal Pain Questionnaire dated March 17, 2002, Claimant indicated that he had constant pain, which was aggravated by walking short distances, bending, or lifting.  He stated that if he rode in a car for more than an hour, his back, neck, and legs went numb. (Tr. at 121.)

On April 8, 2002, Claimant underwent an x-ray of his chest and lumbar spine.  The report showed no abnormalities of his heart, lungs, mediastium or bones.  Lumbarization of S1 and spina bifida occulta of S1 were present, but there was no evidence of fracture or dislocation.  While slight scoliosis was observed, the pedicles and intervertebral disc spaces were within normal limits.  (Tr. at 203.)

Claimant underwent an internal medical examination at the request of the State on April 30, 2002.   (Tr. at 171-7.)

---

[1] Claimant also reported taking other medicines for depression and insomnia, discussed in section (2) below.

7

Claimant's chief complaint was that he "went numb" almost every morning, and that he continued to suffer neck and back problems which he attributed to his 1995 motor vehicle accident. (Tr. at 171.) Stephen Nutter, M.D. recorded Claimant's history based on self-report of neck fracture and fixation/fusion with bone grafting and a one-month's stay in the hospital. Claimant described constant pain in his upper back between his shoulders and into his neck, with his neck causing the most severe pain. Claimant stated that his lower back hurt intermittently, that his pain radiated into his left leg, and that both legs went numb at times. (Tr. at 171-2.) He reported that his neck pain radiated and caused numbness down both of his arms. His back was aggravated by bending, stooping, sitting, lifting, riding in a car, standing, and coughing. His neck pain was aggravated by turning his head, and by rapid movements of his head and neck.

Claimant told Dr. Nutter that he had not undergone any physical therapy, nor did he wear a neck or back brace. Instead, he managed his conditions with heat. Claimant stated that pain radiated up from his neck into his head, resulting in headaches almost daily which ranked 8/10 on a pain scale of 1-10, and which also caused some nausea and photophobia. (Tr. at 172.)

Dr. Nutter observed that Claimant walked with a normal gait without any assistive devices. He appeared stable at station and comfortable in a sitting position, but uncomfortable in a supine

position.   Claimant's intellectual functioning appeared normal during the examination, and his recent and remote memory for medical events was good.  (Tr. at 173.)

Range of motion testing of both shoulders caused a significant amount of neck pain.  Claimant had a positive Phalen's test and a negative Tinel's sign.  All flexions and extensions of Claimant's upper extremities were normal bilaterally.   (Tr. at 174.) Claimant's lower extremities yielded tenderness in the right tibia upon strength testing, but all range of motion testing was normal.

Claimant had tenderness in the paraspinal muscles and spinous processes of his cervical spine, and some paravertebral muscle spasm in his cervical region as well as upper trapezius muscle.  He had 35 degrees of flexion and 40 degrees of extension, 20 degrees of lateral bending to the right and 10 degrees to the left in his neck.   He had 45 degrees of rotation bilaterally.   His neck movements were consistent throughout the exam.  (Tr. at 175.)

Claimant had no paravertebral muscle spasm in his dorsolumbar spine, but was tender in the paraspinal muscles and spinous processes from L4 to S1, and from T9 up to the cervical region. His straight leg raising test was normal in both sitting and supine positions.  He was able to bend at the waist to 65 degrees, lateral bend 30 degrees to the right and 25 degrees to the left, with complaints of pain upon range of motion testing in the lumbar spine.  (Tr. at 175.)

Dr. Nutter recorded that Claimant's muscle strength and tone were normal at 5/5 bilaterally in his upper and lower extremities, with no atrophy. His sensory modalities were well preserved, except for some diminution of vibratory sensation in his feet. He had loss of pinprick sensation just behind the first three digits on his left hand, but intact at the wrist. Claimant was able to walk on his heels and toes, and walked in tandem gait with pain and difficulty. He was unable to squat adequately due to complaints of pain in his left hip, leg, and back. (Tr. at 176.)

Dr. Nutter opined that Claimant suffered chronic back and neck pain due to acute and chronic cervical strain, and chronic dorsal and lumbosacral strain without evidence of radiculopathy. While carpal tunnel syndrome could not be excluded based upon the exam and history alone, Dr. Nutter observed that Claimant's numbness seemed to be more generalized than would be expected for that condition.

Eli Rubenstein, M.D. reviewed Claimant's x-ray report of April 30, 2002, taken in conjunction with Dr. Nutter's examination. Dr. Rubenstein opined that Claimant's lumbar spine was normal. (Tr. at 178.)

State agency medical source Thomas Lauderman, D.O., completed a Physical Residual Functional Capacity Assessment form on May 29, 2002. (Tr. at 179-86.) He concluded that Claimant could occasionally lift and/or carry 50 pounds, could frequently lift or

10

carry 25 pounds, could stand and/or walk for about 6 hours in a normal 8-hour workday, could sit for about 6 hours in a normal 8-hour workday, and could push or pull without limitation. (Tr. at 180.) Claimant had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. at 181-3.) Dr. Lauderman wrote that Claimant's residual functional capacity was reduced secondary to pain and fatigue, and that Claimant was status post cervical fusion. (Tr. at 184.)

State agency medical source Cynthia Osbourne, D.O., completed a Physical Residual Functional Capacity Assessment on August 2, 2002. (Tr. at 224-31.) Her opinions matched those of Dr. Lauderman. (Tr. at 224-31.)

During the period of July 29, 2002 through January 13, 2003, Claimant continued treatment with Dr. Shah. There was no significant change in his condition or the medical findings. (Tr. at 254-61.) On February 7, 2003, Dr. Shah completed a Physical Capacities Questionnaire and Assessment. (Tr. at 262-6.) He indicated that Claimant needed frequent position changes in order to sit, stand, or walk for extended periods of time. Claimant was unable to lift over 20 pounds. Dr. Shah indicated that Claimant could sit, stand or walk for a total of one hour each during an entire 8-hour workday. However, somewhat inconsistently, Dr. Shah also gave the response below to the questionnaire's follow-up inquiry:

11

> If patient is unable to sit, stand or walk less than a total of 8 hours during an 8-hour day, does he/she need to lie down during the day?
>
> Answer: No.

(Tr. at 263.)

Dr. Shah then indicated that Claimant could lift and carry 5 to 10 pounds frequently, 11 to 20 pounds occasionally, and could never lift more than 20 pounds. (Tr. at 263.) He could bend, squat, crawl, climb and reach occasionally. (Tr. at 264.) He was restricted from unprotected heights, had moderate restrictions around moving machinery and vibration, and had mild restrictions due to temperature and humidity, driving equipment, and exposure to environmental irritants such as dust, fumes, gases or chemicals. (Tr. at 263.) Dr. Shah also indicated that Claimant had some mental impairments, discussed in section (2) below.

Claimant treated with Dr. Shah through May 23, 2003. As before, the notes consist mainly of Claimant's subjective complaints, with little or no clinical findings. (Tr. at 267-73.)

   2.   *Mental Impairments*

Claimant underwent a clinical interview and mental status examination at the request of the state on April 26, 2002. (Tr. at 165-70.) Licensed psychologist Paul A. Mulder, Ph.D. found Claimant cooperative but with slightly depressed mood and broad affect. His thought processes appeared logical and coherent, and insight was fair. He appeared to have normal judgment, immediate

memory, and remote memory.  His recent memory was markedly impaired.  Concentration and attention appeared within normal limits.  (Tr. at 168.) Claimant reported that he did not take naps during the day, but spent his time watching television and taking care of his animals.  (Tr. at 169.)  At the time of the examination, Claimant was on probation for domestic violence.  (Tr. at 168.) He reported that he took care of household chores, shopping, and cooking, and handled his own finances.  Dr. Mulder diagnosed dysthymic disorder, for which prognosis was fair. (Tr. at 169.)

State agency medical source Frank D. Roman, Ed.D. completed a Psychiatric Review Technique form on May 20, 2002.  (Tr. at 208-21.)  He opined that Claimant suffered a dysthymic disorder, but had only mild restrictions in his activities of daily living, social functioning, and in maintaining his concentration, persistence or pace.  (Tr. at 218.)  Claimant had no episodes of decompensation of extended duration.  (Tr. at 218.)  On August 1, 2002, James Capage, Ph.D. reviewed and affirmed these findings. (Tr. at 208.)

William R. Hall, M.A., a licensed psychologist retained by Claimant's counsel, conducted a psychological evaluation on January 16, 2003.  (Tr. at 232-6.)  At this evaluation, Claimant reported that he had never had any mental health treatment.  (Tr. at 233.) He stated that he had begun napping about two hours a day in recent

13

months, having suffered insomnia and sleep continuity disturbance since his car accident of 1995. (Tr. at 233.) He described easy fatigability and low energy level, decreased motivation in daily activities, anhedonia, marked frustration related to decreased endurance and mobility, general loss of interest, and a predominately depressed mood. There was no significant impairment in concentration or memory. (Tr. at 233.)

On the WASI, Claimant attained a verbal score of 76, performance score of 98, and full scale IQ score of 85, classifying him in the low average range of intelligence. (Tr. at 235.) On the WRAT-III, Claimant scored 79 in reading, 64 in spelling, and 80 in arithmetic. He received at total score of 35 on the Beck Depression Inventory-II, which Mr. Hall indicated corresponded to a severe level of depression on the interpretive scale. (Tr. at 235.) Mr. Hall diagnosed dysthymic disorder DSM IV-TR 300.4 and opined that Claimant was functioning in the low average range of intellect. He stated that Claimant's overall clinical picture was consistent with dysthymic disorder which had partially responded to anti-depressant medication. (Tr. at 236.)

On a Mental Impairment Questionnaire RFC accompanying his report, Mr. Hall indicated that Claimant's abilities to remember work-like procedures was slightly limited; his ability to remember and understand simple work instructions was slightly limited; and his ability to understand, remember and carry out detailed

instructions was moderately limited. (Tr. at 237-8.) His ability to carry out very simple instructions, to maintain attention for extended periods, to maintain regular attendance and be punctual were all slightly limited. His ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods was moderately limited. (Tr. at 238.) Claimant had mild to moderate limitations in social interaction, and slight limitations in adaptation abilities. (Tr. at 238-9.)

Mr. Hall completed a Psychiatric Review Technique form in which he opined that Claimant suffered moderate restriction in his activities of daily living, in social functioning, and mild difficulties in maintaining concentration, persistence, or pace. (Tr. at 250.)

On the Physical Capacities Questionnaire and Assessment discussed in section (1) above (February 7, 2003), Dr. Shah indicated that Claimant suffered moderate impairment in his ability to sustain concentration and attention due to chronic pain. He also indicated that Claimant suffered anxiety and depression which would preclude him from working in a stressful situation. (Tr. at 265.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not

15

supported by substantial evidence because the ALJ failed to give appropriate weight to the opinions of Claimant's treating physician, Dr. Shah, and (2) the ALJ erred in his findings as to Claimant's credibility and his pain.  (Pl.'s Br. at 4-11.)

    *1.  Treating physician*

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.  <u>See</u> 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2)(2003).  Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence."  <u>Ward v. Chater</u>, 924 F. Supp. 53, 55 (W.D. Va. 1996); <u>see also</u>, 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2003).  The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2)(2003).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6). These factors include: (1) Length of the treatment relationship and

frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors.  Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."  <u>Id.</u> §§ 404.1527(d)(2), 416.927(d)(2).

In this case, the ALJ acknowledged the weight generally afforded to a treating source's opinion.  (Tr. at 26.) However, as he noted, even a treating physician's opinion must be supported by medically acceptable clinical and laboratory diagnostic techniques, and must not be inconsistent with other substantial evidence.  (Tr. at 26, <u>citing</u> 20 C.F.R. 404.1527, 416.927, and SSR 96-7P.) Weighing these factors, the ALJ determined that Dr. Shah's opinion was not entitled to controlling weight.  First, the medical evaluation which Dr. Shah submitted to the DHHR was based upon his *initial office visit* with Claimant; at that time, Dr. Shah had no greater familiarity with Claimant than any other one-time examiner would have had.  Moreover, while this report indicated that Claimant was unable to perform full-time work, it did not detail any specific functional limitations, and did not offer any clinical findings in support of that opinion.[2]  (Tr. at 26, <u>citing</u> tr. at 161-4.)  The

_____

[2]    For these same reasons, Dr. Janicki's review and affirmation of this evaluation are of little value.  Dr. Janicki did not examine Claimant, but affirmed Dr. Shah's report based on

ALJ indicated that he gave some weight to the physical capacity assessment that Dr. Shah made in February 2003, due to the frequency of his followup with Claimant over a period of 16 months. (Tr. at 26, citing tr. at 262-6.) However, the ALJ found that the limitations identified in this report were likewise not well supported by objective clinical or laboratory findings in either the assessment itself or in Dr. Shah's treatment record. Finally, the ALJ noted that the report inconsistently states that Claimant did not need to lie down during the day, yet could not sit, stand and/or walk for more than a total of three hours in any eight-hour period. (Tr. at 26, citing tr. at 263.)

Claimant argues that the ALJ's decision as to his functional capacity is "conclusory," and that the ALJ should have afforded controlling weight to Dr. Shah's opinions. He argues that the factual support for Dr. Shah's opinions can be gleaned from Dr. Nutter's report, which corroborates Dr. Shah's findings. (Pl.'s Br. at 6.) The court disagrees, and finds that the ALJ properly applied the factors above. While some of Dr. Nutter's findings match Dr. Shah's findings, Dr. Nutter did not draw any conclusions from these, nor from the scant objective medical evidence, as to Claimant's functional capacity. By contrast, state agency medical sources reviewing the clinical findings and the objective evidence

---

its content and conclusions alone. Thus, Dr. Janicki's opinions suffer the same deficiencies as Dr. Shah's report.

reached solid and consistent conclusions that Claimant was capable of medium-level work. (Tr. at 180-1, 225-31.)

Contrary to Claimant's argument, the ALJ considered the lack of medical evidence to support Dr. Shah's opinion.  He noted that there was no x-ray evidence of nerve root or cord compression, no clinical evidence of radiculopathy, and no clinical explanation for Claimant's complaints of generalized numbness in his upper extremities.   (Tr. at 25.)   X-ray evidence did not show degenerative disease and there were no clinical signs of the arthritis of which Claimant complained.   Id.   The ALJ also observed that the level and intensity of treatment refuted disabling pain and/or numbness: Claimant's sole course of treatment was a conservative medication regimen, including nonsteroidal anti-inflammatory drugs, muscle relaxants, Tylenol # 3 and then Lortab, which does not appear to have been prescribed on any ongoing basis[3].   Id.   Claimant did not undergo electromyography or nerve conduction studies or a neurological evaluation to assess his alleged numbness or pain.   Indeed, the ALJ observed, Claimant's complaints to Dr. Shah indicate a stable condition, rather than the acute difficulties he alleges.   Finally, as discussed further in section (2) below, the ALJ also found that Claimant's activities of

_____

[3] The ALJ stated that he had requested a prescription statement confirming the level of Claimant's Lortab use; these were not provided.  The amount of medication reflected by Dr. Shah's records indicate that only 30 tablets were prescribed, to be taken twice daily as needed.  (Tr. at 25, citing tr. at 149-54; 191.)

daily living did not correspond to the limitations he alleged.

Thus, Dr. Shah's conclusions as to Claimant's limitations stand alone, lack clinical or laboratory support, and contradict the remainder of the record.  For these reasons, the ALJ correctly discounted Dr. Shah's opinions.

   *2.  Credibility*

Claimant argues that the ALJ erred in assessing Claimant's degree of pain and limitation, particularly in discounting his self-reports of same.  (Pl.'s Br. at 9-11.)

A two-step process is used to determine whether a claimant is disabled by pain.  First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain alleged.   20 C.F.R. §§ 404.1529(b) and 416.929(b) (2003); SSR 96-7p, 1996 WL 374186 (July 2, 1996); <u>see also</u>, <u>Craig v. Chater</u>, 76 F.3d 585, 594 (4th Cir. 1996).  If such an impairment is established, then the intensity and persistence of the pain and the extent to which it affects a claimant's ability to work must be evaluated.  <u>Craig</u>, 76 F.3d at 595.  When a claimant proves the existence of a medical condition that could cause pain, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence."  <u>Mickles v. Shalala</u>, 29 F.3d 918, 919 (4th Cir. 1994).  Objective medical evidence of pain should be gathered and

considered, but the absence of such evidence is not determinative. Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (2003). Additionally, the regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons. . . . Factors relevant to your symptoms, such as pain, which we will consider include:
>
> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
>
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3)(2003).

SSR 96-7p repeats these two-step regulatory provisions. Both

21

_Craig_ and this regulation provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself.  _Craig_, 76 F.3d at 585, 594; SSR 96-7p, 1996 WL 374186, at *2 ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record").  Nevertheless, _Craig_ does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision.  The only analysis which _Craig_ prohibits is one in which the ALJ rejects allegations of pain _solely_ because the pain itself is not supported by objective medical evidence.

In this case, Claimant argues that his pain is evidenced by the fact that Dr. Shah repeatedly prescribed pain medication, that physicians repeatedly noted his complaints of pain, and that his complaints of pain have been consistent throughout this case. (Pl.'s Br. at 10.)  However, the ALJ did not find that Claimant was _pain-free_; he found that the pain was not as severe or limiting as Claimant alleged.  He specified that the medical evidence did not establish an abnormality that could reasonably result in the symptoms and restrictions Claimant described.  (Tr. at 24.) Claimant's spinal x-rays showed only lifelong conditions of slight scoliosis, spina bifida occulata, and lumbarization of S1, which

would not account for disabling pain.  Claimant had no degenerative
changes.  (Tr. at 24, _citing_ tr. at 203.)  The x-rays did not show
nerve root or cord compression. Even Dr. Nutter found no evidence
of radiculopathy. (Tr. at 24, 25, 171-77.)  Notes submitted after
the second hearing did not offer any findings concerning Claimant's
alleged left-side numbness.  (Tr. at 24.) There were no recent
electromyography or nerve conduction studies and no neurological
evaluations.  There were no clinical signs of arthritis.  (Tr. at
25.) Thus, while Claimant's complaints of chronic neck, shoulder
and low back pain were objectively confirmed, the severity of that
pain and the numbness Claimant described were not supported by the
record.  (Tr. at 24-5.)

    The ALJ considered Claimant's description of the intensity and
frequency of his pain, together with the modalities Claimant used
to alleviate pain.  (Tr. at 23.)  He then noted that while Claimant
alleged severe pain and incapacity as a result of these injuries
arising from a 1995 motor vehicle accident,(tr. at 171), he
apparently did not have a treating doctor and was not taking any
medications at the time he visited Dr. Shah in October 2001, just
prior to filing for disability.  (Tr. at 23.)

    The ALJ then considered the course of Claimant's treatment for
his alleged disabling pain.  (Tr. at 25.) He found that the
medication regimen itself refuted disabling pain and/or numbness.
The medications were not those prescribed for nerve pain.  As

indicated above, the prescription notes of record do not show that Claimant was taking Lortab on a consistent or daily basis. (Tr. at 25.) The ALJ observed that the nature of Claimant's complaints to Dr. Shah indicated a stable condition without any acute symptoms. (Tr. at 25, citing tr. at 187-206, 254-61, 267-73.)

Next, the ALJ observed that many of the limitations in Claimant's activities of daily living were due to factors other than pain. (Tr. at 25.) At the time of filing, Claimant lived with his girlfriend and her two children, and performed household chores as well as cooking, shopping, and caring for his animals. He stated that he needed help washing, bathing, and dressing. (Tr. at 25, citing tr. at 126-9, 168-9.) Later, Claimant moved in with his mother, who assumed the household chores and tasks, not due to any deterioration of Claimant's condition, but because "it's the way I was raised." (Tr. at 25, citing tr. at 236.) After moving in with his mother, Claimant did not require help washing, bathing or dressing anymore. (Tr. at 26, citing tr. at 132, 141, 236.)

The court concludes that the ALJ properly considered the factors applicable to the pain and credibility analysis, and that his opinion is supported by substantial evidence.

Claimant also asserts that the ALJ's question to the vocational expert failed to adequately describe his condition. When the VE was asked to accept all of Claimant's subjective complaints as credible, he could not identify any jobs which

24

Claimant could perform. (Pl.'s Br. at 11.)

To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments. Walker v. Bowen, 889 F.2d 47, 51 (4th Cir. 1989). Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record. See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe. Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983).

In this case, after ensuring that the VE was familiar with Claimant's work profile, the ALJ inquired:

> Assume an individual of the Claimant's age, education, and work experience, who has a residual functional capacity for light work. Non-exertionally the individual is limited to routine, repetitive tasks. No work requiring understanding and remembering detailed instructions, no work requiring the carrying out of detailed instructions so that's can't do [sic] understanding or carrying out detailed instructions, routine, repetitive tasks. No reaching above shoulder level. No public contact. No jobs requiring full range of motion of the neck to either side***and no exposure to unprotected heights, no noisy work environments. Now, can the individual engage in any jobs?

(Tr. at 306-7.)

The VE testified that such an individual could perform work as a parking lot attendant, a pattern ruler, or handkerchief presser. (Tr. at 307.)[4] However, if the person lacked range of motion in his neck, he would not be able to perform these jobs. Nor would he be able to perform them if he were absent one day a week due to exacerbation of symptoms. (Tr. at 307-8.) The VE further testified on cross-examination that employers may have a concern about using workers in such positions who were under the influence of narcotic pain medications. (Tr. at 315.) If Claimant were limited to sitting, standing, and walking for one hour each, there would not be any employment available to him. (Pl.'s Br. at 6, tr. at 335.)

The record, however, does not establish that Claimant has such limitations. Claimant is not without range of motion in his neck. It has not been shown that he would need to be absent one day a week due to pain symptoms. As discussed, his prescription history does not reveal any ongoing use of narcotic medications. For reasons above, the ALJ correctly concluded that the restrictions imposed by Dr. Shah lacked support; accordingly, he correctly declined to include those restrictions in the question to the vocational expert.

---

[4]    The VE later testified that Claimant could perform jobs as a subassembler; a cutter-and-paster, press clippings; and a dowel inspector. (Tr. at 323, 333-4.) Based on all of these, the ALJ found that Claimant was capable of performing a significant number of jobs. (Tr. at 30-2, 34.)

The court proposes that the presiding District Judge find that the ALJ's opinion was supported by substantial evidence in all respects.  It is hereby respectfully **RECOMMENDED** that the presiding District Judge **DENY** the Plaintiff's Motion for Judgment on the Pleadings, **GRANT** the Defendant's Motion for Judgment on the Pleadings, **AFFIRM** the final decision of the Commissioner and **DISMISS** this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have ten days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Copenhaver, and this Magistrate Judge.

The Clerk is directed to file this written opinion and Order and to mail a copy of the same to counsel of record.

<u>     May 17th, 2006     </u>
          Date

*Mary E. Stanley*
Mary E. Stanley
United States Magistrate Judge

28